**IN THE COURT OF APPEALS OF IOWA**

No. 25-1410
Filed December 17, 2025

**IN THE INTEREST OF B.S.,**
**Minor Child,**

**B.B., Mother,**
　　　Appellant.
_____

　　　Appeal from the Iowa District Court for Dallas County, Erica Crisp, Judge.


　　　A mother appeals the termination of her parental rights to her child.
**AFFIRMED.**


　　　Karen A. Taylor of Taylor Law Offices, P.C., Des Moines, for appellant mother.

　　　Brenna Bird, Attorney General, Natalie Hedberg, Assistant Attorney General, for appellee State.

　　　Paul White, Des Moines, attorney and guardian ad litem for minor child.


　　　Considered without oral argument by Greer, P.J., and Ahlers and Badding, JJ.

**GREER, Presiding Judge.**

A mother appeals the juvenile court order terminating her parental rights to her child. The mother alleges: (1) the State failed to prove the grounds for termination, (2) termination is not in the child's best interests, and (3) exceptions apply to prevent termination. After a de novo review of the record, we affirm.

## I. Background Facts and Proceedings.

The mother gave birth to B.S. in January 2022. B.S.'s biological father is unknown.[1]

Due to the mother's preexisting opioid-use issues, the mother used prescribed methadone throughout her pregnancy and at the time she gave birth to B.S. After the child was born, she experienced withdrawal symptoms and had to be weaned off methadone. B.S. also had a stroke at birth, which a doctor attributed to the drug in her system. Even now, the child has lingering, but improving, eye issues due to the stroke.

The child first came to the attention of the Iowa Department of Health and Human Services (HHS)[2] in April 2022, when she was approximately three months old. At that time, police found the mother and her paramour passed out in their vehicle after a single-vehicle accident. The mother and her paramour had overdosed on fentanyl.

---

[1] The mother's paramour was originally thought to be the child's father until he was excluded by a paternity test. The juvenile court terminated the parental rights of all putative fathers on October 30, 2024. No putative fathers appealed that determination.

[2] At the time, the department was still known as the Iowa Department of Human Services. We use its current name to avoid confusion.

When police found the couple, the mother was slumped over while holding the child. When the mother was removed from the vehicle, officers found a baggie near the child with a substance that later tested positive for fentanyl. Given the situation in which she was found, the child was at risk both of suffocation and fentanyl exposure. Both the mother and her paramour were charged criminally after this incident.

The State filed a petition to adjudicate B.S. as a child in need of assistance (CINA) and temporarily remove the child from the mother's care. At first, HHS placed the child with the maternal grandfather for approximately one week, until the grandfather tested positive for methamphetamine. After that, the child was removed from his care and placed with the paramour's parents (the "fictive grandparents").[3]

After the child was removed from the mother's care, the mother underwent substance-use and mental-health evaluations. She began participating in intensive outpatient therapy and medication assisted treatment. The mother completed a SafeCare program through Children and Families of Iowa. As the mother progressed through her treatment, her visits with B.S. progressed from supervised, to semi-supervised, to unsupervised. The mother was subject to random drug screenings, which were negative.

---

[3] "'Fictive kin' means an adult person who is not a relative of a child but who has an emotionally positive significant relationship with the child or the child's family." Iowa Code § 232.2(22) (2025).

Given the mother's progress, on March 1, 2023, the juvenile court held a permanency hearing, after which it ordered the child to be returned to the mother's care under HHS supervision. The court set a review hearing for June.

A little over a month later, however, HHS suspected the mother was under the influence of a drug while acting as the sole caregiver for B.S. after it was reported that the mother was disoriented, struggling to keep her eyes open, and rambling while taking care of the child. The mother later tested positive for THC. The child was again removed from the mother's custody and placed with the fictive grandparents.

At this time, the mother actively participated in services; she was able to stay sober. Based on the mother's demonstrated sobriety, in September, HHS recommended that the child again be returned to the mother's care under its supervision. Soon after, the court approved the change in placement.

Unfortunately, concerns again arose about the mother's substance use approximately one month later. A safety plan was put in place so that the child could remain in the mother's care. One of the requirements of the safety plan was that the mother was not to watch the child without supervision from her paramour. A few days later, however, an HHS social worker saw the mother and maternal grandfather in public without the paramour present. Given the maternal grandfather's substance-use issues, he was not a suitable supervisor of the mother and B.S.

On November 3, the child was removed from the mother's care a third time after a service provider observed the mother, while the sole caretaker for the child, stumbling and slurring her words. After this incident, the mother again tested

positive for THC. The mother later claimed that this behavior was due to a then-undiagnosed thyroid issue, rather than a substance-use or mental-health issue. The HHS social worker concluded that the mother was misusing her prescriptions and had not been forthcoming to her healthcare providers about her methadone use. The social worker was concerned that the mother's lack of honesty regarding her prescriptions led to the mother taking medications that interacted negatively. The child was again placed with the fictive grandparents, and the mother went back to supervised visits.

On April 8, 2024, the State filed its first petition to terminate the mother's parental rights. However, in the meantime, the mother continued attending substance-use counseling. On July 8, the mother was successfully discharged from substance-use counseling after completing the program.

On September 18, the juvenile court held a termination hearing. After the hearing, the court determined that the State failed to meet its burden to show that the mother had a severe substance-related disorder because the mother's counselor testified that the mother had maintained sobriety—with the exception of positive THC tests—for over two years and she did not believe the mother had a severe substance use related disorder at that time. According to the counselor, the mother's substance-use disorder was in remission.

The district court concluded:

Although the State has submitted evidence that the mother has a substance abuse issue, there is a lack of evidence that her use has been continued and repeated throughout this case. The mother has tested positive on several drug tests, but these were spread out over time (three in the last two and a half years) and there is insufficient evidence that these are not isolated incidents. Furthermore, these tests were positive for THC only. [HHS] also essentially stopped

testing the mother after the third removal. Finally, the mother has been randomly tested through her probation and it has not been reported by her probation officer that she has tested positive for any controlled substance.

However, the court did express concerns about the reliability of the mother's counselor's testimony:

> The Court has significant concerns about the credibility of the mother's substance abuse counselor. She is clearly not a "neutral" witness, insofar as she very clearly feels it is her role to advocate for the mother. Nevertheless, much of what she testified to is not contradicted by other credible evidence in the record. She testified that at this point the mother does not have a diagnosable substance abuse disorder and considers the mother in remission. The Court finds that the State has not met its burden as to this ground.

Despite concluding the State had failed to meet its burden, the juvenile court noted, "It is deeply unsettling to the Court to order reunification at this point in time, and it [is] not without severe reservation that the Court comes to this conclusion. However, given the statutory framework, the Court concludes it is the correct choice, though not an easy one."

The child was gradually placed back in the mother's care as the mother continued to demonstrate sobriety. The child was fully returned to the mother's care in January 2025. On March 31, the HHS social worker met with the mother and discussed the possibility of closing the case. A review hearing was set for April 9.

On April 3, however, the mother reached out to a friend of a friend to ask if he had fentanyl. The person stated he did, and the mother went to meet him. The man gave the mother a baggie of what looked like crushed-up, different-colored pills. The mother took the substance in a parking lot then drove home to the paramour and B.S. The next morning, the paramour, unaware that the mother had

ingested anything, found the mother unresponsive in the living room. He administered Narcan, which was ineffective, and called 911. He did chest compressions on the mother until the paramedics arrived. Unfortunately, the child was present during this incident.

Paramedics arrived and took the mother to the hospital, where she remained for several days, including spending time on a ventilator. Drug testing at the hospital revealed the mother tested positive for amphetamines, opiates, benzodiazepines, and methadone.[4] The mother was not aware she had taken any substance other than fentanyl. The mother later reported that she ingested the powder because she was feeling depressed and did not have a good support system. After this overdose, the child was removed from the mother's care and placed with the fictive grandparents for a fourth time.

After the mother's release from the hospital, she reengaged with substance-use treatment. She underwent a new substance-use evaluation and was diagnosed with opioid use disorder, severe. The evaluation also recommended individual and group therapy, mental-health therapy, and medication assisted treatment.

On April 9, the State filed another petition to terminate the mother's parental rights under Iowa Code section 232.116(1)(*l*). In the meantime, the mother continued participating in substance-use counseling and mental-health therapy. Although the mother was initially resistant to mental-health therapy, after the April

---

[4] The mother was taking a prescription at the time that could have resulted in a positive test result for amphetamines. HHS reported, however, that the mother had never tested positive for amphetamines in prior drug screens despite taking this medication.

overdose, she acknowledged that she had mental-health issues she needed to address. The mother also continued attending weekly visits with B.S.

The juvenile court held a hearing on the termination petition on June 17. The court took judicial notice of the underlying CINA proceedings and the first termination proceedings. The juvenile court heard testimony from the fictive grandmother, the mother's aunt, the mother's paramour, the HHS social worker, the mother's substance-use counselor, and the mother. HHS and the child's guardian ad litem (GAL) recommended termination of the mother's parental rights.

On April 12, 2025, the juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(*l*). The mother timely appealed.

## II. Standard of Review.

Our review is de novo. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). "While we are not bound by the juvenile court's factual findings, we accord them weight, especially in assessing witness credibility." *In re J.H.*, 952 N.W.2d 157, 166 (Iowa 2020). "We will uphold an order terminating parental rights if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). "Evidence is clear and convincing when there are no serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence." *Id.* (cleaned up).

## III. Analysis.

"We generally apply a three-step analysis to review termination of parental rights." *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). First, we determine whether the statutory ground for termination has been established. *Id.* If so, we next determine whether termination is in the child's best interests. *Id.* Finally, even if

we conclude termination is in the child's best interests, we will nevertheless consider whether any permissive exception to termination applies. *Id.*

The mother alleges the district court erred at every step in the analysis. We will address each step in turn.

**A. Statutory Grounds for Termination.** The juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(*l*), which provides that the court may terminate parental rights when:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96 and custody has been transferred from the child's parents for placement pursuant to section 232.102.
> (2) The parent has a severe substance use disorder as described by either of the following:
> > (a) The severe substance use disorder meets the definition for that term as defined in the most current edition of the diagnostic and statistical manual prepared by the American psychiatric association, and the parent presents a danger to self or others as evidenced by prior acts.
> > (b) The disorder is evidenced by continued and repeated use through the case, the parent's refusal to obtain a substance use disorder evaluation or treatment after given the opportunity to do so, and the parent presents a danger to self or others as evidenced by prior acts.
> (3) There is clear and convincing evidence that the parent's prognosis indicates that the child will not be able to be returned to the custody of the parent within a reasonable period of time considering the child's age and need for a permanent home.

Iowa Code § 232.116(1)(*l*).

On appeal, the mother does not dispute that the State proved the first element of section 232.116(1)(*l*). Instead, the mother disputes (1) that she has a severe substance-use disorder as defined by the statute and (2) that the child could not be returned to her custody within a reasonable period of time. The mother argues that the evidence produced at the termination hearing showed that,

since the latest overdose, she had been making significant progress, reengaged in services, including mental-health treatment, and recognized the changes that needed to be made. According to the mother, "There was no evidence presented that the [overdose] was not just an isolated incident." For that reason, according to the mother, there is no reason why the child could not be returned to her care at the time of the termination hearing or within a reasonable period of time.

We conclude there is clear and convincing evidence that each of the requirements of section 232.116(1)(*l*) has been met. First, regarding whether the mother has a severe substance-use disorder, the mother's most recent substance use evaluation resulted in a diagnosis of F11.20, opioid use disorder, severe. The mother received this diagnosis after she nearly died of an overdose after ingesting an unknown pill powder she got from a friend of a friend. The mother's diagnoses, along with her drug use, provides clear and convincing evidence that the State proved the mother has a "severe substance use disorder." *See In re L.H.*, 949 N.W.2d 268, 271 (Iowa Ct. App. 2020) (concluding there was clear and convincing evidence of a severe substance-use disorder when "the mother was diagnosed with F15.20 amphetamine type substance disorder, severe and F10.10, alcohol use disorder, mild"); *see also In re L.B.*, No. 21-0937, 2021 WL 3896359, at *3 (Iowa Ct. App. Sept 1, 2021) (concluding that there was clear and convincing evidence of a severe substance-use disorder when the mother was diagnosed with F11.20 opioid use disorder, severe, "coupled with her history of illegal drug usage").

Next, there is clear and convincing evidence that the mother is a danger to herself as well as to B.S. if left alone in the mother's care. Two of the four removals

in this case occurred after the mother was incapacitated by fentanyl while caring for or in the presence of the child. The other two removals occurred after the mother was suspected of being under the influence of drugs while caring for the child. The mother's most recent relapse was nearly fatal, and she was fully incapacitated while B.S. was in her care and vicinity. Fortunately, the mother's paramour found her, administered Narcan, called 911, and was there to protect the child. The mother spent days in the hospital, including some time on a ventilator. The mother's prior acts show that she is a danger to herself, and thereby a danger to the child, who would be wholly reliant on the mother for care.

Finally, there is clear and convincing evidence that the child could not be returned to the mother's care at the time of termination or within a reasonable time thereafter. At the termination hearing, when the mother was asked whether the child could be returned to her care, she replied, "Yes. If I continue in treatment."

As the juvenile court aptly noted:

> The child has been removed from her mother's care four times; she demonstrates sobriety when the child is not in her care, and within no more than three months of the child's return, the mother has consistently relapsed. The child is at a young age that the repeated removals are traumatizing to her.

The mother has been unable to maintain her sobriety long term. While she can remain sober when the child is not in her care, the mother has consistently relapsed within three months of the child's placement with her. *J.H.*, 952 N.W.2d at 171 ("[R]ather than speculate about what the future holds for" a parent, "it is more accurate to look in the rear-view mirror and make a decision for [the child] based on what has already happened." (citation omitted)). We conclude the State

proved that B.S. could not be returned to her mother at the time of the termination hearing or within a reasonable time thereafter.

Based on the foregoing, the State has shown the statutory grounds for termination under Iowa Code section 232.116(1)(*l*) by clear and convincing evidence. We next consider whether termination was in the child's best interests.

**B. Best Interests.** The mother argues that termination is not in B.S.'s best interests. We disagree.

"Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the [child's] best interests." *In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) (citation omitted). "We 'give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child.'" *Id.* (quoting Iowa Code § 232.116(2)). "[W]e look to the child's long-range as well as immediate interests, consider what the future holds for the child if returned to the parents, and weigh the child's safety and need for a permanent home." *In re L.T.*, 924 N.W.2d 521, 529 (Iowa 2019) (cleaned up). "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012) (citation omitted).

We conclude that termination of the mother's parental rights is in the child's best interests. By all accounts, the mother is a good parent when she is sober. And we do not doubt that the mother loves the child. However, she has consistently demonstrated that she is incapable of maintaining sobriety so she can

safely parent B.S. on her own. *See W.M.*, 957 N.W.2d at 314 ("This is exactly the sort of case where we must not deprive a child of permanency on the hope Mom will get better. Mom clearly loves her children. Yet, we cannot deprive these children of a stable home on the hope that Mom will someday be able to succeed in her efforts to remain sober."); *see also D.W.*, 791 N.W.2d at 707 ("We do not gamble with the children's future by asking them to continuously wait for a stable biological parent, particularly at such tender ages." (internal quotation marks omitted)). B.S. has spent most of her young life in the care of her fictive grandparents. The fictive grandparents have provided a safe and stable home for the child, who has done well in their care. Both HHS and the GAL agreed that termination was in the child's best interests. Considering the child's age, the amount of time she has spent out of the mother's care, the child's need for permanency and safety, and the mother's inability to maintain sobriety, termination is in B.S.'s best interests.

**C. Permissive Exception to Termination.** Finally, the mother argues permissive exceptions to termination apply based on (1) the child's placement with a relative and (2) the strength of the parent-child bond. We decline to apply these permissive exceptions to termination in this case.

"Once we have established that the termination of parental rights is in the child['s] best interests, the last step of our analysis is to determine whether any exceptions in section 232.116(3) apply to preclude the termination." *In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016). These exceptions "are permissive, not mandatory." *A.M.*, 843 N.W.2d at 113. "[T]he parent resisting termination bears the burden to establish an exception." *In re A.S.*, 906 N.W.2d 467, 476 (Iowa

2018). "We may use our discretion, based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship." *M.W.*, 876 N.W.2d at 225 (cleaned up). In any event, "[t]he child's best interests always remain the first consideration." *In re C.K.*, 558 N.W.2d 170, 174 (Iowa 1997).

Iowa Code section 232.116(3) provides, in relevant part,

> The court need not terminate the relationship between the parent and child if the court finds any of the following:
>     a. A relative has legal custody of the child.
>     . . . .
>     c. There is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship.
>     . . . .

Iowa Code § 232.116(3)(a), (c).

1. *Relative placement.* The mother first argues that termination is not in B.S.'s best interests because she is in the care of a relative. We determine this permissive exception is not applicable.

In this case, the child is not in the legal custody of relatives; HHS has legal custody. And, in this context, a "relative" is defined as "an individual related to a child within the fourth degree of consanguinity or affinity, by marriage, or through adoption." Iowa Code § 232.2(56). While the paramour was originally thought to be the child's father, paternity testing excluded him. The child is placed with the paramour's parents, the fictive grandparents. But here, they are not the mother's or the child's biological relatives and custody is with HHS. For these reasons, this permissive exception to termination does not apply.

To the extent the mother is seeking a guardianship, even if the child were in a relative placement, we conclude that a guardianship is not preferable to

termination in this case. *See In re B.T.*, 849 N.W.2d 29, 32 (Iowa Ct. App. 2017) ("[G]uardianship is not a legally preferable alternative to termination."); *see also A.S.*, 906 N.W.2d at 478 (discussing factors relevant to guardianship determinations). With a guardianship in place, the fictive grandparents would then be in the position to monitor the mother's sobriety to protect the child from exposure and we find termination best protects the child and achieves the stability the child needs.

2. *Closeness of parent-child bond.* Next, the mother argues that termination is not in B.S.'s best interests due to the closeness of the parent- child bond. We disagree.

"We begin by noting that 'love is not enough to trigger this exception.'" *In re L.B.*, No. 21-0937, 2021 WL 3896359, at *4 (Iowa Ct. App. Sept. 1, 2021) (citation omitted). "The relevant consideration when assessing this exception is not the parent's love for the child, but whether the child will be disadvantaged by termination." *Id.*; *see also D.W.*, 791 N.W.2d at 709 (same).

At the time of the termination hearing, the child was three and one-half years old. She had spent nearly three-fourths of her life living with her fictive grandparents. The longest, continuous amount of time the child had spent with her mother in her lifetime was three months, after which she was removed due to her mother's drug use.

At the termination trial, the fictive grandmother testified that each removal had been more difficult for the child as she has grown older. The fictive grandmother described the child's behaviors, noting some anger issues and confusion when the child transitioned back to their care after a removal from her

mother. After the most recent removal, B.S. told her fictive grandmother that her mom did not wake up because she took the wrong medicine and was in the hospital, showing she is becoming aware of the mother's substance-use issues.

B.S. is doing well in her fictive grandparents' care and has formed a bond with them. And the fictive grandparents would like to adopt B.S. and have become licensed to do so. Termination will allow the child to achieve the permanency she deserves. *See W.M.*, 957 N.W.2d at 315 ("We do not discount that there is a bond between Mom and both boys. But Mom has failed to provide the clear and convincing evidence necessary to show that, on balance, that bond makes termination more detrimental than not.").

The mother has not shown by clear and convincing evidence that termination would be detrimental to the child. For that reason, we decline to apply this permissive exception to termination.

### IV. Conclusion.

Based on our de novo review of the juvenile court record, we conclude the State proved by clear and convincing evidence the grounds for termination under Iowa Code section 232.116(1)(*l*), termination is in the child's best interests, and that the mother did not meet her burden to prove a permissive exception applies to prevent termination. We therefore affirm the decision of the juvenile court terminating the mother's parental rights to B.S.

**AFFIRMED.**